# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-18-159-D |
| | ) | |
| DR. JAMES M. FERRIS, M.D., | ) | |
| KATHERINE DOSSEY, and | ) | |
| SHERRY ISBELL, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

On July 30, 2019, the Court conducted a *James*[1] hearing to determine the admissibility of certain out-of-court statements to be offered by the government at trial as alleged coconspirator statements under FED. R. EVID. 801(d)(2)(E). This hearing was requested by all three Defendants [Doc. Nos. 40, 41, 47, 48, 71], and the United States agreed that the Court should make a pretrial determination of the admissibility of certain coconspirator statements [Doc. Nos. 62-65]. The statements at issue are described in the Second Amended Notice of Co-Conspirator Hearsay Statements [Doc. No. 97] filed by the United States.

At the *James* hearing, the United States offered evidence (Gov't Ex. Nos. 1-3, Demonstratives A, B), which the Court admitted for the limited purpose of the hearing.

---

[1] *United States v. James*, 590 F.2d 575 (5th Cir. 1979); *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995).

The United States also offered the testimony of Special Agent Randall House, an agent with the Office of Inspector General for the United States Department of Health and Human Services, who investigated the alleged crimes at issue.[2]

The statements at issue are ones made by the three Defendants – Dr. James M. Ferris, M.D., Katherine Dossey, and Sherry Isbell.[3] Defendants are charged in a 103-count Indictment with distributing controlled substances outside the usual course of professional medical practice, in violation of 18 U.S.C. § 841(a)(1), and Medicare fraud, in violation of 18 U.S.C. § 1347. Although Defendants are not charged with conspiracy, they are charged with the substantive crimes and with aiding and abetting the substantive crimes of each other. 18 U.S.C. § 2. The time frame of the alleged scheme set forth in the Indictment is September 1, 2015 through December 9, 2015.

## STANDARD OF DECISION

To show the admissibility of statements under FED. R. EVID. 801(d)(2)(E), the United States must establish by a preponderance of the evidence that (1) "'a conspiracy

---

[2] Other agencies involved in the investigation included the Drug Enforcement Administration ("DEA"), the Oklahoma Bureau of Narcotics and Dangerous Drugs, the Oklahoma State Board of Pharmacy ("Pharmacy Board"), and the Oklahoma Medical Board ("Medical Board").

[3] On July 30, 2019, prior to the *James* hearing, Ms. Isbell pled to a one-count Superseding Information, charging Medicare fraud, in violation of 18 U.S.C. § 1347. [Doc. Nos. 88, 90-95]. Specifically, the Superseding Information alleges that from September 1, 2015 and continuing through December 9, 2015, Dossey and Dr. Ferris devised a scheme to defraud Medicare, and that Isbell learned of the scheme in November 2015 and participated in it.

existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy.'" *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995) (*quoting United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994)). In making its determination, the Court "may consider and rely on the actual coconspirator statements the government seeks to admit to determine whether a predicate conspiracy existed within the meaning of FED. R. EVID. 801(d)(2)(E)." *Owens*, 70 F.3d at 1124.

"[I]n deciding whether the offering party has satisfied its burden at a *James* hearing, the district court has the discretion to consider any evidence not subject to a privilege, including both the coconspirator statements the government seeks to introduce at trial and any other hearsay evidence, whether or not that evidence would be admissible at trial." *Id*. Some independent evidence, other than the statements themselves, must be presented linking the defendant to the conspiracy. *See Id*.; *see also United States v. Martinez*, 825 F.2d 1451, 1453 (10th Cir. 1987). "Such independent evidence may be sufficient even when it is not 'substantial.'" *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996) (*quoting United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993)).

It is not necessary that a conspiracy be charged in the Indictment for the United States to take advantage of FED. R. EVID. 801(d)(2)(E). *See United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990); *see also* FED. R. EVID. 801 advisory committee's note ("While the rule refers to a coconspirator, it is this committee's understanding that the

3

rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged."); *James,* 590 F.2d at 585 n. 1 (Tjoflat J. & Ainsworth J., specially concurring) (noting that the majority's rule affects any prosecution implicating "scheme-type criminal conduct," including aiding and abetting under 18 U.S.C. § 2).

"Statements by a conspirator are in furtherance of the conspiracy when they are 'intended to promote the conspiratorial objectives.'" *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (*quoting United States v. Reyes,* 798 F.2d 380, 384 (10th Cir. 1986)). "Such promotion occurs through statements that explain events of importance to the conspiracy in order to facilitate its operation, statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy, and statements of a coconspirator identifying a fellow coconspirator." *Townley*, 472 F.3d at 1273 (internal quotations and citations omitted).

Finally, a "conspiracy for the purpose of the hearsay exclusion need not be unlawful; the statement may be made in furtherance of a 'lawful joint undertaking.'" *United States v. Nelson*, 732 F.3d 504, 516 (5th Cir. 2013) (*quoting United States v. El-Mezain*, 664 F.3d 467, 502 (5th Cir. 2011)); *see also United States v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir. 1986) (it is not necessary for the government to prove that the conspiracy was for unlawful purposes, but merely that a combination existed between the defendant and third parties);

4

*United States v. Brockenborrugh*, 575 F.3d 726, 735-736 (D.C. Cir. 2009) ("Rule 801(d)(2)(E) allows for admission of statements by individuals acting in furtherance of a lawful joint enterprise.").

## DISCUSSION

The Indictment sets forth the alleged business relationship between Dr. Ferris, Isbell and Dossey. [Doc. No. 1 at 5-8]. At the *James* hearing, SA House testified about their relationship, and Government's Demonstratives A and B provide further clarification. Dr. Ferris, a licensed physician, was a salaried employee of Physicians at Home ("PAH"), a home health care company located in Wellston, Oklahoma. PAH was owned and operated by Isbell. Dr. Ferris also practiced medicine at Mid-Oklahoma Medical Access Clinic ("MOMAC"), which was located across the street from the PAH office in Wellston. MOMAC was also owned and operated by Isbell. Dossey, a licensed pharmacist, owned and operated Wellston Clinic Pharmacy, which was in the same building as MOMAC. Dossey owned the building which housed the Wellston Clinic Pharmacy and MOMAC.

Dr. Ferris was the only physician employed by PAH in the fall of 2015. PAH employed several mid-level practitioners (e.g., physician's assistants and nurse practitioners), who Dr. Ferris supervised. In the fall of 2015, PAH had about 2,000 patients. Similarly, Dr. Ferris was the only physician at MOMAC. He oversaw several mid-level practitioners at MOMAC. MOMAC had about 300 patients in the fall of 2015.

According to the Indictment and Superseding Information against Isbell,[4] in early 2015, Isbell and Dossey agreed to a business model in which the Wellston Clinic Pharmacy would fill prescriptions for Schedule II controlled substances and deliver those prescriptions to PAH patients. [Doc. No. 1 at ¶ 24; Doc. No. 88 at ¶ 24]. To facilitate this business model, Isbell gave Dossey access to the medical records of PAH patients. [Doc. No. 88 at ¶ 25]. Isbell also gave Dossey access to the medical records of MOMAC patients. *Id*. at ¶ 26. On November 1, 2015, Isbell sent a letter to all PAH patients advising them that all Schedule II prescriptions would be filled at the Wellston Clinic Pharmacy "unless otherwise requested by the patient and approved by PAH." Gov't Ex. No. 3.

Sometime in November 2015, Isbell learned that Dr. Ferris was providing pre-signed, blank prescription pads to Dossey, and Dossey was writing those prescriptions for Schedule II drugs, filling the prescriptions, and delivering them to PAH and MOMAC patients. [Doc. No. 88 at ¶ 30]. After learning about Dr. Ferris and Dossey's conduct, Isbell did not make any attempt to stop or modify the agreed business practice. *Id.* Rather, she continued to employ Dr. Ferris; continued to permit Wellston Clinic Pharmacy to fill prescriptions for PAH and MOMAC patients; continued the policy that PAH patients' prescriptions would be filled at the Wellston Clinic Pharmacy; and continued to provide Dossey with medical records for PAH and MOMAC patients. *Id.*

---

[4] The information in this paragraph was also derived from Isbell's statements at her plea hearing and SA House's testimony at the *James* hearing.

According to SA House, in Oklahoma, only a licensed physician with a DEA registration number can prescribe Schedule II controlled substances. Dr. Ferris had a DEA registration number and is licensed by the State of Oklahoma. SA House described the proper protocol for issuing scheduled drug prescriptions under the Code of Federal Regulations. Prior to prescribing a scheduled drug, a physician should conduct a thorough examination of the patient. The prescription must be dated and signed by the physician on the same day it is issued, and it "shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a). Although a nurse or assistant may help a physician write out a prescription, the physician must have an opportunity to review the accuracy of the prescription before he signs it. 21 C.F.R. § 1306.05(f).[5] Refilling a Schedule II drug is prohibited under federal regulations. 21 C.F.R. § 1306.12(a). A physician must sign a new prescription each time a patient needs a Schedule II drug. SA House testified that if the prescription is not written in such a manner it is considered invalid under the federal regulations.

SA House testified that the investigation of Defendants began after the Pharmacy Board received an e-mail from a relief pharmacist questioning whether it was proper for the Wellston Clinic Pharmacy to have a patient's entire medical file. On December 7,

---

[5] "A corresponding liability rests upon the pharmacist … who fills the prescription in the form prescribed by DEA regulations." 21 C.F.R. § 1306.05(f).

2015, an investigator from the Pharmacy Board visited Dossey at the Wellston Clinic Pharmacy. During his visit, the investigator found a pre-signed, blank prescription pad by Dr. Ferris. Gov't Ex. No. 1.

On December 9, 2015, that investigator, along with his supervisor and an investigator from the Medical Board, made a follow-up visit to the Wellston Clinic Pharmacy. During a tour of the facility, they saw the pre-signed, blank prescription pad signed by Dr. Ferris. *Id.*

Dossey explained to investigators that after PAH moved across the street from the pharmacy, she began seeing more prescriptions for PAH patients. [Doc. No. 97 at 8]. With Dr. Ferris out in the field and an increase in patients needing prescriptions, Dossey approached Dr. Ferris about leaving a pre-signed prescription pad for her to use to fill prescriptions. *Id.* at 8-9. Dossey advised that she was the only one permitted to fill these prescriptions. *Id.* at 9.

Dossey further explained that she had access to the electronic medical records of PAH and MOMAC patients. *Id.* She was able to view the entire patient file and determine when a patient was due to run out of medication. *Id.* SA House stated that Dossey recorded the information in a logbook. A few days before a prescription was due to run out, she would write in the prescription on the blank prescription form that Dr. Ferris had pre-signed. *Id.* Dossey would then fill the prescription and have it delivered to the patient's home. Dossey advised that she treated these prescriptions as call-in prescriptions from Dr.

Ferris, although Dr. Ferris had not actually called in the prescription.

The investigators informed Dossey that the practice of writing in prescriptions on pre-signed, blank prescription pads was improper. SA House advised that the investigators confiscated two blank prescription pads, which contained about 100 pre-signed forms by Dr. Ferris, from an open safe inside the Wellston Clinic Pharmacy. Dossey also had blank prescription pads from PAH and MOMAC that had not been signed. She explained that the blank prescriptions were for Dr. Ferris to sign when he was in the office.

Dossey provided investigators with a letter that Dr. Ferris had allegedly written on June 29, 2015, in which Dr. Ferris appointed Dossey as his agent to monitor the dispensing of controlled drugs and to complete the blank prescription pads that were pre-signed by him. Gov't Ex. No. 2.[6]

SA House interviewed Rob Phillips, a physician's assistant at PAH who was supervised by Dr. Ferris. In the fall of 2015, Phillips saw blank prescription pads pre-signed by Dr. Ferris at the Wellston Clinic Pharmacy. Phillips advised Dr. Ferris that calling Dossey his "agent" for the purpose of filling in prescription information was "not going to fly." [Doc. No. 97 at 3]. Dr. Ferris indicated that he would talk to Dossey and Isbell. Phillips also discussed the practice with Isbell in the fall of 2015, and she told

---

[6] Stacy Russell, a pharmacy technician employed by Dossey, informed investigators that this letter was written long after June 2015. She recalled Dossey contacting Dr. Ferris and Isbell in December 2015, and requesting an "agent letter" to show that Dr. Ferris had designated Dossey as his agent for completing his prescriptions.

Phillips he was "crazy." *Id*. at 4. When Phillips warned Dossey about the practice, Dossey advised that she had used the same procedure at a pharmacy she owned in Beggs, Oklahoma. *Id.*

Stacy Russell also saw blank, pre-signed prescription pads from Dr. Ferris in the fall of 2015. Russell advised that Dossey instructed her to keep a logbook reflecting when PAH patients were due to run out of their medications each month. While dispensing medication for PAH and MOMAC patients, Russell realized that the prescriptions included those that Dossey had written herself on pages bearing Dr. Ferris' signature. In addition, Dossey instructed Russell to write in prescription information on blank, unsigned prescription pads for PAH patients. Dossey told Russell that they were using the pre-signed, blank prescription procedure "so as not to bother Dr. Ferris" while he was treating patients in the field. [Doc. No. 97 at 6].

Russell recalled overhearing a conversation in the fall of 2015 between Dossey and Isbell in which Dossey asked Isbell for more pre-signed, blank prescription pads. Russell further advised that Dossey's practice of using pre-signed, blank prescription pads by Dr. Ferris did not stop after the Pharmacy Board's visit on December 9, 2015.

In the fall of 2015, John Davis was a delivery driver for the Wellston Clinic Pharmacy. Dossey directed him to go to Dr. Ferris' home to pick up pre-signed, blank prescription pads from Dr. Ferris. Davis advised investigators that Dr. Ferris told him that he "wasn't keen" on providing Dossey with the pre-signed pads. [Doc. No. 97 at 9].

Isbell told SA House that in mid-November 2015 she learned Dr. Ferris was pre-signing blank prescription pads and leaving them for Dossey to complete. Dr. Ferris confirmed to Isbell that he was doing this, and he advised that Dossey had given him a form to sign that Dossey had obtained from the Pharmacy Board's website. [Doc. No. 97 at 9]. Isbell asked Dossey about the practice, and Dossey confirmed that Dr. Ferris had left her pre-signed, blank prescription pads for her to use. *Id.* at 10.

Based on records received from Oklahoma's Prescription Monitoring Program (PMP) and Medicare claims data, SA House concluded that Dossey was utilizing Dr. Ferris' blank, pre-signed prescription pads from September 1, 2015 to December 9, 2015.[7] According to SA House, during this time frame Dossey completed and filled 1,700 invalid Schedule II prescriptions – about 720 prescriptions were paid for by Medicare, totaling almost $54,000.00. Based on his investigation and knowledge of Medicare procedures, SA House testified that Medicare would not have paid for these prescriptions had it been aware of the procedure in place at the Wellston Clinic Pharmacy.

Based on the testimony of SA House and the evidence received at the hearing, the Court finds, by a preponderance of the evidence, that Dr. Ferris, Dossey, and Isbell were members of a joint enterprise or venture from September 1, 2015 through December 9, 2015. Evidence was presented that Dr. Ferris, Dossey, and Isbell were engaged in a

---

[7] SA House also indicated that Dr. Ferris stipulated at the Medical Board hearing that this scheme began on September 1, 2015, and both Dr. Ferris and Dossey testified under oath at that hearing and admitted the operative facts of the scheme.

business relationship by June 29, 2015. As of that date, Dr. Ferris purported to appoint Dossey as his agent to monitor the dispensing of controlled drugs and to complete the blank prescription pads that were pre-signed by him.[8] Gov't Ex. No. 2. Earlier in 2015, Isbell and Dossey had agreed that Wellston Clinic Pharmacy would fill prescriptions for Schedule II controlled substances and deliver those prescriptions to PAH patients. Isbell gave Dossey access to the medical records of PAH patients to accomplish that objective in early 2015. Isbell's letter to PAH patients on November 1, 2015 also confirms PAH's practice of using Wellston Clinic Pharmacy exclusively to fill Schedule II prescriptions. Gov't Ex. No. 3.

Although Isbell maintains that she did not know Dr. Ferris was providing Dossey with blank, pre-signed prescription pads until mid-November 2015, Dossey and Dr. Ferris could not have accomplished their business scheme without access to the patient files, which Isbell provided. Further, Dr. Ferris was a salaried employee of Isbell. Isbell could have directed him to stop the practice; she could have fired him; she could have cut off Dossey's access to the patient files; or she could have used a different pharmacy for PAH patients. Instead, Isbell did nothing and allowed Dr. Ferris and Dossey to continue this practice.

---

[8] An alternative theory of admissibility for Dossey's statements against Dr. Ferris is FED. R. EVID. 801(d)(2)(D), which excludes from the hearsay definition statements "made by the party's agent or employee on a matter within the scope of that relationship and while it existed."

"A conspiracy for the purpose of the hearsay exclusion need not be unlawful; the statement may be made in furtherance of a 'lawful joint undertaking.'" *United States v. Nelson*, 732 F.3d 504, 516 (5th Cir. 2013) (*quoting United States v. El-Mezain*, 664 F.3d 467, 502 (5th Cir. 2011)). "A conspiracy may be shown 'merely by engaging in a joint plan[] … that was non-criminal in nature.'" *Id.* Therefore, "'a statement is not hearsay if it was made during the course and in furtherance of a common plan or endeavor with a party.'" *Id.* Rule 801(d)(2)(E), derived from agency and partnership law, "embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are not hearsay and are admissible against the others, if made in furtherance of the common goal." *United States v. Weisz*, 718 F.2d 413, 433 (D.C. Cir. 1983).

The United States demonstrated "some community of purpose" among Dr. Ferris, Dossey, and Isbell – for example, to "ensure better service and care for [PAH] patients" by having their Schedule II prescriptions filled exclusively at the Wellston Clinic Pharmacy and delivering those prescriptions to the patients' homes. *Id; see also* Gov't Ex. No. 3.[9]

---

[9] The November 1, 2015 letter cites several reasons for the exclusivity policy, including that PAH physicians "do not carry prescription pads with them for safety reasons." Gov't Ex. No. 3. The letter indicates that the policy "will provide prescription processing in a more effective and efficient way … patients will enjoy prescription delivery directly to them, which is a convenience many patients have indicated they very much appreciate." *Id.* This is consistent with Dossey's statements to Russell that they were using the pre-signed, blank prescription procedure "so as not to bother Dr. Ferris" while he was treating patients in the field. [Doc. No. 97 at 6].

Again, to accomplish this goal, Isbell provided Dossey with access to the patient files, and Dr. Ferris provided Dossey with the blank, pre-signed prescription pads. *See, e.g., Nelson*, 732 F.3d at 516 (holding that the district court did not abuse its discretion in finding that the defendant, who was a former mayor, shared a common purpose with another mayor, to recruit a waste cleaning business to their towns); *United States v. Brockenborrugh*, 575 F.3d 726, 735-736 (D.C. Cir. 2009) (finding that the defendant and his realtor were engaged in a "business relationship" and "lawful joint enterprise" to acquire property; thus, the realtor's statements to the seller's lawyer that the defendant was interested in buying the property were made in furtherance of this enterprise and properly admitted under FED. R. EVID. 801(d)(2)(E)); *United States v. Postal,* 589 F.2d 862, 886 n. 41 (5th Cir. 1979) (admission of a ship's logbook under the co-conspirator exception was appropriate because the ship's crew was engaged in the voyage of the ship, which was "a 'joint venture' in and of itself apart from the illegality of its purpose").

Thus, it is immaterial whether Isbell's agreement with Dr. Ferris and Dossey prior to mid-November 2015 was criminal in nature.[10] *Id.* The United States established that "a combination existed between" Isbell, Dr. Ferris, and Dossey. *United States v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir. 1986) (the government need not prove that the conspiracy was

---

[10] Further, it is not necessary that each member know all the details of the conspiracy, "as long as he is aware of its general scope." *United States v. Behrens*, 689 F.2d 154, 160 (10th Cir. 1982).

for unlawful purposes); *Brockenborrugh*, 575 F.3d at 735 (admission is not contingent upon the finding of an unlawful combination).

Thus, considering the substance of the statements, and the evidence presented at the hearing, the Court finds that the statements identified in the United States' Second Amended Notice of Co-Conspirator Hearsay Statements [Doc. No. 97], except for Statement 12, were made in the course of or in furtherance of the joint enterprise.[11] "Statements by a conspirator are in furtherance of the conspiracy when they are intended to promote the conspiratorial objectives." *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (internal quotation marks omitted). The focus is not on the statement's "actual effect in advancing the goals of the conspiracy, but on the declarant's intent in making the statement." *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993) (internal quotation marks omitted).

Statements 1 through 3 made by Dr. Ferris, Dossey, and Isbell to Phillips were apparently designed to allay Phillips' suspicions. *See United States v. Williamson*, 53 F.3d 1500, 1520 (10th Cir. 1995); *Perez*, 989 F.2d at 1578. Statements 4 through 7, 11, and 13 helped facilitate the operation of the joint enterprise. Statements 8, 9, and 10 were statements between joint venturers to facilitate the operation of the enterprise. However,

---

[11]Nothing herein, however, precludes Defendants from making timely objections regarding particular proffered statements if the use of such statements would otherwise be objectionable.

Statement 12 – Dr. Ferris' statement to John Davis that he "wasn't keen" on giving Dossey the pre-signed prescriptions – does not appear to promote any enterprise objective. Statement 14 informed Isbell of the status of the joint enterprise and was made, perhaps, to placate or provide reassurance to Isbell. Statement 15 informed Isbell of the status of the joint venture, and it described the activities of another joint venturer (Dr. Ferris).

Statement 16 are statements made by Dossey to investigators on December 9, 2015. Russell advised that Dossey's practice of using pre-signed, blank prescription pads by Dr. Ferris did not stop after the Pharmacy Board's visit on December 9, 2015. Whereas here "successful accomplishment of the crime necessitate[ed] concealment," Dossey's acts of concealment to investigators could have been done in furtherance of the main criminal objectives. *Grunewald v. United States*, 353 U.S. 391, 405 (1957) (there is a "vital distinction … between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.")

For instance, Dossey's statements to the Pharmacy Board investigators that she treated these prescriptions as "call-in" prescriptions by Dr. Ferris could be perceived as an effort to justify her actions and preserve the cohesiveness of the joint enterprise. If the Pharmacy Board had shut down Dossey's pharmacy, this would have interfered with Defendants' continued scheme to defraud Medicare, at least with Medicare claims still being processed on December 9. *See, e.g., Forman v. United States*, 361 U.S. 416, 424

(1960), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978) (holding that a conspiracy to evade income taxes extended to false statements made to IRS agents because "concealment of the 'holdout' income must continue if the evasion is to succeed. It must continue until action thereon is barred and the evasion permanently effected."); *United States v. Rabinowitz*, 56 F.3d 932, 934 (8th Cir. 1995) (holding that a conspiracy to defraud a client by using a wire transfer included the defendant's subsequent lies to a revenue agent to conceal the nature of those transfers).

## CONCLUSION

Accordingly, the Court finds that the United States has made a showing by a preponderance of the evidence that Defendants were members of a joint enterprise, and that certain statements described during the *James* hearing fall within the categories of statements that would generally be considered in furtherance of that enterprise. This ruling does not bar contemporaneous objection by Defendants at trial regarding particular statements, as set forth herein.

**IT IS SO ORDERED** this 20th day of August 2019.

TIMOTHY D. DeGIUSTI
Chief United States District Judge